**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Asheville Division**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BON WORTH, INC., | ) | Case No. 19-10317 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**EMERGENCY MOTION OF DEBTOR-IN-POSSESSION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR-IN-POSSESSION (A) TO ENTER INTO POST-PETITION LOANS WITH CROSSROADS FUNDING I, LLC AND (B) TO USE CASH COLLATERAL AND (II) GRANTING RELATED RELIEF**

Bon Worth, Inc. ("Bon Worth", the "Debtor" or the "Company"), debtor and debtor-in-possession in the above-captioned case, hereby moves (the "Motion") the Court for entry, on an emergency basis of the "Interim Order" substantially in the form attached hereto as Exhibit 1, and a Final Order, pursuant to sections 105, 361, 363, and 364 of title 11 of the U.S. Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing post-petition loans ("DIP Financing") with Crossroads Funding I, LLC, a Delaware limited liability company ("Crossroads", the "Pre-Petition Secured Party" or the "Post-Petition Lender") and use of cash collateral as set forth below:

(i)   authorization for the Debtor to obtain a first priority secured post-petition financing facility (the "DIP Facility"), in the form of a loan in the aggregate amount of up to $1.3 million from the Post-Petition Lender, plus interest, costs, fees, and other expenses and amounts provided for in the following documents:

  (a) the Interim Order;

  (b) the Loan and Security Agreement (the "Credit Agreement") dated February 21, 2019, by and between the Debtor and Crossroads Financing, LLC and assigned to Crossroads pursuant to the Assignment Agreement dated as of February 25, 2019 (and the corresponding Uniform Commercial Code Financing Statements), attached hereto as Exhibit 2;

1

  (c) the Ratification and Amendment Agreement (the "Ratification Agreement") dated _____, 2019, by and between the Debtor and Crossroads, substantially in the form attached hereto as <u>Exhibit 3</u>; and

  (d) the Subordination Agreement (the "Merchant Coterie DIP Subordination Agreement"), dated _____, 2019, by and between the Debtor, Crossroads and Merchant Coterie, Inc. ("Merchant Coterie"), a New York corporation, substantially in the form attached hereto as <u>Exhibit 4</u>, (and the Credit Agreement, the Ratification Agreement and the Merchant Coterie DIP Subordination Agreement are hereinafter collectively referred to as the Crossroads DIP Loan Documents (the "Crossroads DIP Loan Documents");

(ii) authorization for the Debtor to execute and deliver the Crossroads DIP Loan Documents and to perform such other and further acts as may be required in furtherance of the DIP Facility and the Crossroads DIP Loan Documents;

(iii) authorization for the Debtor to draw on the DIP Facility in accordance with the Crossroads DIP Loan Documents, and to use proceeds of the DIP Facility to pay for, among other things, working capital, general corporate purposes of the Debtor, and the expenses associated with administration of the case, but only in accordance with the then-current Budget, a copy of the proposed Budget is attached hereto as <u>Exhibit 5</u>;

(iv) subject to the Carve-out (as defined in the Interim Order), the granting of allowed superpriority administrative expense claim status in the case to the DIP Facility and all obligations arising thereunder (collectively, the "<u>Post-Petition Obligations</u>");

(v) subject to the Carve-out (as defined below), the granting to Crossroads, automatically perfected first-priority security interests in and liens on all of the property, assets or interests in property of the Debtor, Debtor's "estate" (as defined in the Bankruptcy Code), in each case of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, intellectual property, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases (and proceeds from the disposition thereof), money, investment property, deposit accounts, all commercial tort claims and other causes of action, all cash and cash equivalents of the Debtor and all cash and non-cash proceeds, rents, products, substitutions, accessions and profits of any of the collateral described above (collectively, with respect to all such entities, the "<u>Collateral</u>") to secure all Post-Petition Obligations;

(vi) authorization for the Debtor to use, among other things, in accordance with the Budget, any cash collateral (as that term is defined in Bankruptcy Code Section 363(a) and described below) (the "<u>Cash Collateral</u>") in which the Pre-Petition Secured Party or

   Merchant Coterie may have an interest and the granting of adequate protection to the Pre-Petition Secured Party and Merchant Coterie with respect to any diminution in value of its interests in the Pre-Petition Collateral (as defined below) arising from, inter alia, the Debtor's use of the Pre-Petition Collateral (including Cash Collateral) and the priming of the first-priority liens of the Pre-Petition Secured Party and the pre-petition liens of Merchant Coterie by the DIP Facility;

(vii) subject to and only effective upon the entry of a Final Order granting such relief, the waiver by the Debtor of any right to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(viii) modification of the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to provide Crossroads with the relief necessary to implement and effectuate the terms and provisions of the Crossroads DIP Loan Documents;

(ix) pursuant to Bankruptcy Rule 4001, that an interim hearing on the Motion (the "Interim Hearing") be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "Interim Order"); and

(x) that a final hearing (the "Final Hearing") be held to consider entry of a final order (the "Final Order") authorizing the balance of the credit available under the Crossroads DIP Loan Documents and any requested relief not granted under this Interim Order on a final basis, all as set forth in the Motion and the Crossroads DIP Loan Documents.

In support of this Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1. As set forth below and reflected in the Budget, the Debtor has an immediate and acute need for debtor-in-possession financing and to continue to use its cash on hand. The Debtor was unable to secure post-petition financing on an administrative priority or junior lien basis (other than the limited supplemental financing with Merchant Coterie discussed below), and the Pre-Petition Secured Party, at the request of the Debtor, has agreed to provide debtor-in-possession financing to fund this chapter 11 case and provide the Debtor with the time and money necessary to complete a comprehensive marketing and "going concern" competitive sale process designed to maximize the value of the Debtor's assets. Absent the requested relief, including immediate access to the Debtor's encumbered cash and initial borrowings, the Debtor will be unable to operate

3

HTPL: 740676v3

its business, and will be forced to liquidate its assets without obtaining going concern value, to the detriment of all its constituents and employees. Therefore, the Debtor respectfully requests that the Court approve the DIP Facility and use of cash collateral on the terms described in the Crossroads DIP Loan Documents.

## JURISDICTION

2. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and the Motion is proper under 28 U.S.C. § 1408.

3. The statutory bases for the relief requested herein are sections 105, 361, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014.

## BACKGROUND

4. On August 16, 2019 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5. The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee, trustee, or examiner has been appointed in this case.

## BUSINESS BACKGROUND

A.  **History and Corporate Structure**

6. The Debtor is wholly owned by Kyong Kook Kim, the sole shareholder of the Debtor. The Debtor is headquartered in Hendersonville, North Carolina. The Debtor was founded in 1966 in Hendersonville, North Carolina, and is a women's retail clothing chain. As of the Petition Date, the Debtor operates approximately fifty (50) retail stores. Most of these

4

stores are located in shopping centers or other commercial retail locations. The Debtor does not own any real estate and leases all of its locations.

7. Bon Worth provides quality women's fashion clothing and accessories. The Company offers a variety of women's clothing and accessories in its stores, as well as through its online portal, www.bonworth.com, and Facebook.

8. The Debtor has been successful in creating a vibrant social media presence, and can provide customers with product offerings from both its physical store locations combined with its online services.

9. The Debtor's management team has a great depth of experience in the retail industry. Yisan So serves as Chief Executive Officer and David A. Herman serves as Chief Operating Officer, respectively. In addition to this experienced management team, on March 23, 2019, the Debtor entered into an Ownership Transfer and Management Services Agreement (the "Management Agreement") with Merchant Coterie. In order to assist the Debtor in remaining a viable entity pending a sale of the company, Merchant Coterie made cash advances and delivered substantial inventory to the Debtor, on credit, prior to the Petition Date at a time when the Debtor's access to trade credit was significantly constrained. The pre-petition advances provided by Merchant Coterie are subject to a subordination agreement between Crossroads and Merchant Coterie (the "Merchant Coterie Pre-Petition Subordination Agreement" and, together with the Merchant Coterie DIP Subordination Agreement, the "Subordination Agreements") pursuant to which Merchant Coterie has agreed to subordinate all of its liens and claims, whether arising before or after the Petition Date, to the pre-and post-petition loans and liens of Crossroads. Although Merchant Coterie did not consummate a transfer of the Debtor's ownership before the Petition Date, the Debtor intends to promptly file a motion with the Court establishing bidding

HTPL: 740676v3

procedures for the sale of substantially all of its assets, with Merchant Coterie as a "stalking horse" purchaser. The Debtor seeks approval of the DIP Facility with the Post-Petition Lender in order to have sufficient liquidity to allow the company to operate pending the conclusion of the sale process.

**B.** **Events Leading to the Petition Date**

10. Historically, the Debtor's operating model, focusing on retail locations as well as expanding its online offerings, was very successful. However, in 2016 and continuing through the present date, the Debtor began seeing a significant decline in income in connection with its retail locations. The trend of declining income from retail operations is not unique to the Debtor and has impacted brick and mortar retailers throughout the U.S., as evidenced by the numerous bankruptcy filings in the recent past. In the twelve (12) months prior to the Petition Date, the Debtor has exited approximately fifty-eight (58) underperforming leased stores. Over the last twelve (12) months, the Debtor has attempted negotiations with landlords to reduce current rents and occupancy costs to take into account the lower profits due to declining sales levels at the stores. The Debtor has had only limited success in renegotiating lease rates to a level that would allow these stores to operate profitably. Prior to the Petition Date, the Debtor determined that it is in the Debtor's best interests to close these fifty-eight (58) underperforming stores (the "Closed Stores") in retail centers across the United States. In the months preceding the Petition Date, the Debtor ceased operations in the Closed Stores and surrendered the premises to the applicable landlords.

**CROSSROADS' PRE-BANKRUPTCY SECURED LENDING BACKGROUND**

11. On or about February 21, 2019, Crossroads and the Debtor entered into the Credit Agreement in which the Debtor could borrow up to $1.0 million from Crossroads. As noted

6

above, prior to the Petition Date, the Debtor also owed monies to and entered into loan agreements with Merchant Coterie (the "Pre-Petition Merchant Coterie Loan Agreements") which loans are subject to the Merchant Coterie Pre-Petition Subordination Agreement. The Debtor intends, by separate motion, to seek this Court's approval of debtor-in-possession financing with Merchant Coterie (the "Merchant Coterie DIP Financing") to make supplemental loans and advances of inventory to the Debtor. The Merchant Coterie DIP Financing will be subordinate to the Pre-Petition Indebtedness and Pre-Petition Lien granted to Crossroads, as well as the claims and liens granted to Crossroads under the DIP Facility pursuant to the Merchant Coterie Subordination Agreements.

12. The Debtor acknowledges that, as of August 3, 2019, the aggregate principal amount of approximately $739,826.26 was outstanding in respect of the Credit Agreement, together with interest on the foregoing and fees, expenses and other charges incurred in connection therewith as provided in the Credit Agreement, collectively, the "Pre-Petition Indebtedness").

13. To secure the Pre-Petition Indebtedness and pursuant to the Credit Agreement, the Debtor granted the Pre-Petition Secured Party perfected, first priority, liens and security interests (collectively, the "Pre-Petition Lien") in substantially all of the Debtor's personal property including, without limitation, accounts receivable, inventory and equipment wherever located, then owned or thereafter acquired or arising, and the proceeds of the foregoing (collectively, the "Pre-Petition Collateral"). All of the Pre-Petition Collateral is collateral for all of the Pre-Petition Indebtedness.

14. Certain amounts on deposit as of the Petition Date in the Debtor's banking, checking, and other deposit accounts constitute Pre-Petition cash collateral within the meaning

of section 363 of the Bankruptcy Code ("Cash Collateral"), in which the Pre-Petition Secured Party has a security interest that secures the Pre-Petition Indebtedness.

15.     To the best of the Debtor's knowledge, the Pre-Petition Secured Party has a blanket lien on substantially all of the personal property of the Debtor's estate as of the Petition Date as set forth above.

### NEED FOR POST-PETITION FINANCING AND USE OF POST-PETITION CASH COLLATERAL

16.     The Debtor's goal in this case is to effectuate a "going concern" sale transaction whereby substantially all of the Debtor's assets would be sold through a rapid but thorough marketing and auction process to the highest and best bidder for the benefit of the Debtor's creditors and other parties in interest. The Debtor intends to promptly submit a sale procedure motion to this Court for a competitive sale process in which Merchant Coterie will be the "stalking horse" bidder.

17.     The Debtor requires debtor-in-possession financing ("DIP Financing") in order to continue its business operations in this chapter 11 case through the end of the sale transaction. The Debtor has an immediate and emergency need for DIP Financing and use of Post-Petition cash collateral to pay the expenses of operating its business including, without limitation, salaries, administrative and leasing costs, utilities, services, repairs, maintenance, and insurance costs in its capacity as debtor-in-possession. Specifically, without additional financing and use of Post-Petition cash collateral, the Debtor cannot pay wages, salaries, rents, utilities, and other expenses associated with operating its business.

18.     The Debtor also requires the use of the Post-Petition cash collateral to fund the administrative expenses of these cases, including the fees and expenses of attorneys, financial

consultants, accountants and other professionals authorized by the Court to be employed by the Debtor or a Creditors' Committee.

19. The availability of DIP Financing and use of Post-Petition cash collateral will provide the Debtor with more than just the necessary cash and credit support they need to operate their businesses. Of almost equal importance is the sense of confidence that such financing and use of cash collateral post-petition will instill in the Debtor's suppliers, customers, and employees. The failure of the Debtor's suppliers and employees to cooperate with the Debtor at this time, and the loss of customer patronage, could irreparably harm the Debtor's hopes of maximizing the value of its assets through a sale process.

20. In sum, without immediate access to DIP Financing and the use of cash collateral, the Debtor will continue to suffer the acute liquidity crisis that existed Pre-Petition, threatening the Debtor's ability to maintain its operations in the short term. The Debtor's ability to continue as a going concern and effectuate a sale transaction under chapter 11 of the Bankruptcy Code is dependent upon the Debtor obtaining the interim and final relief requested in this Motion.

## DESCRIPTION OF PROPOSED POST-PETITION FINANCING

21. The Debtor proposes to enter into certain post-petition financing transactions as described in greater detail herein (the "DIP Loans") with Crossroads.

22. As described in detail above, Crossroads served as the Debtor's primary prepetition lender and has indicated its willingness to provide financing to the Debtor on a post-petition basis.

23. The Debtor and Crossroads have agreed to allow the pre-petition Credit Agreement to be ratified as the post-petition DIP Facility, except for the provisions which are amended pursuant to the Ratification Agreement.

HTPL: 740676v3

24. The Debtor negotiated the terms of DIP Loans with Crossroads and the use of cash collateral with Crossroads at arms' length and in good faith (as that term is defined in sections 363(m) and 364(e) of the Bankruptcy Code), with all parties represented by experienced counsel. The Debtor's liquidity crisis is acute and for the Debtor to negotiate alternative financing with any lender group other than Crossroads, which is already familiar with the Debtor's operations, corporate structure and financial arrangements, would be extremely difficult.

25. The Debtor believes that the terms and conditions of the DIP Loans are fair and reasonable and in the best interest of the Debtor's estate.

26. For the foregoing reasons, the Debtor is seeking entry of an interim, emergency order and a Final Order, each approving the DIP Financing and use of cash collateral as proposed herein. Crossroads has agreed to provide the DIP Loans to the Debtor and Crossroads has agreed to consent to use of cash collateral only on the terms and conditions as are substantially set forth in the Interim Order and the Crossroads DIP Loan Documents attached herein and incorporated herein by reference.

27. Set forth below is a summary of the salient terms of the proposed Crossroads DIP Loan Documents and use of cash collateral:[1]

    A.    DIP Loan:

        1.    Maximum loan amount – The pre-petition maximum loan amount of up to $1.0 million will be increased to up to $1.3 million under the DIP Facility. As a condition to increase the maximum loan amount from $1.0 million to $1.3 million as set forth in the preceding sentence, Crossroads requires that: (i) Merchant Coterie loan not less than $500,000.00 to the Debtor on a subordinated basis (junior to Crossroads); and (ii) Merchant Coterie delivers goods to the Debtor in the amounts and at the times set forth in the Budget;

---

[1] The description of the DIP Facility provided herein is superseded in its entirety by the terms of the Crossroads DIP Loan Documents and the proposed Interim Order attached herein.

10

HTPL: 740676v3

2. Asset based lending loan – The post-petition DIP Facility borrowing base calculation will remain the same as under the pre-petition Credit Agreement, which is the lower of (a) 70% of Inventory Cost or (b) 85% of Net Orderly Liquidation Value;

3. DIP Facility Fee – 2% of the Maximum Loan Amount of $2.0 million, or $40,000.00;

4. Interest Rate — The post-petition DIP Facility interest rate will remain the same as under the pre-petition Credit Agreement, which is the greater of (i) the three month LIBOR rate plus 3.2% or (ii) 6%;

5. Initial Term Date – Initial Term shall mean the earliest to occur of (a) February 21, 2020, (b) thirty (30) days after the entry of the Interim Financing Order if the Permanent Financing Order has not been entered prior to the expiration of such thirty (30) day period (or such longer period if consented to in writing by Crossroads), (c) substantial consummation (as defined in Section 1101 of the Bankruptcy Code), but in any event not later than the effective date of a plan of reorganization filed in the Chapter 11 Case pursuant to an order entered by the Bankruptcy Court, (d) the date the Bankruptcy Court orders the conversion of the bankruptcy case of Debtor to a Chapter 7, (e) the date the DIP Facility is otherwise terminated for any reason whatsoever pursuant to the terms of the DIP Facility, (f) subject to the Financing Order, the acceleration of the Obligations or termination of the DIP Facility hereunder, including without limitation, as a result of the occurrence of an Event of Default, (g) the closing of the sale of all or substantially all of the Debtor's assets provided, however, that for the purpose of determining the "Contractual Termination Date," the Initial Term shall be February 21, 2020;

6. Payment of Pre-Petition Indebtedness – Crossroads may apply post-petition proceeds to the pre-petition indebtedness;

7. Approval of, and compliance with, a budget for the Debtor (the "Budget");

8. Collateral — Subject to a carve-out (the "Carve-Out") described below, the DIP Loans will be secured by a first priority lien on property of the Debtor pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code;

11

9. Administrative Expense – Subject to the Carve-Out, Crossroads will be entitled to administrative expense priority pursuant to sections 364(c)(1) and 507 of the Bankruptcy Code;

10. Carve-Out – A Carve-Out from Crossroads Collateral, and the term "Carve-Out" means (a) the unpaid Allowed Professional Fees (defined below) and expenses in an amount not to exceed (i) up to $70,000.00 for the Debtor's proposed restructuring counsel, Horack, Talley, Pharr & Lowndes P.A., being the same as the aggregate amount of the Professional Fee Payments deposited into such professional's trust account in accordance with the terms herein and the Budget, (ii) up to $70,000.00 for the Debtor's proposed financial advisors, The Finley Group, being the same as the aggregate amount of the Professional Fee Payments deposited into such professional's trust account in accordance with the terms herein and the Budget, and (iii) $35,000.00 for the professionals retained by any Creditors' Committee that may be appointed in this case, (b) all allowed administrative expenses pursuant to 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Bankruptcy Court and pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the Bankruptcy Administrator, (c) the Trailing Employee Expenses (defined below), and (d) the unpaid Allowed Professional Fees occurred from and after the occurrence of an Event of Default in an aggregate amount not to exceed $35,000.00, which professional fee reserve shall be divided as follows: (i) up to $15,000.00 for Allowed Professional Fees of Horack, Talley, Pharr & Lowndes, P.A., (ii) up to $15,000.00 in Allowed Professional Fees of The Finley Group, and (iii) up to $5,000.00 for Allowed Professional Fees for counsel to the official committee of unsecured creditors, if any. For the avoidance of doubt, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation of any professional. For purposes of this Motion, the term "Allowed Professional Fees" shall mean the unpaid reasonable fees and expenses of professionals (i) actually incurred on or after the Petition Date and (ii) allowed at any time by a final order of the Court pursuant to §§ 326, 328, 330 or 331 of the Bankruptcy Code. For purposes of this Motion, the term, "Trailing Employee Expenses" shall mean that notwithstanding the termination of the DIP Facility and any use of cash collateral, following the Maturity Date the Debtor shall, to the extent set forth in the Budget, be permitted to pay all unpaid and accrued amounts payable to employees of the Debtor, including, but not limited to, unreimbursed expenses, payroll, all taxes related to such payroll and regularly scheduled contributions to the employee healthcare plan that were incurred

HTPL: 740676v3

prior to the Maturity Date. Crossroads shall have the right to establish reserves with respect to the Carve-Out; and

11. Adequate Protection to Crossroads —to the extent of any Collateral Diminution (as defined in the Interim Order), Crossroads shall maintain the Pre-Petition Liens and the Debtor shall grant valid and perfected replacement security interests in and liens on any of the Collateral in which Crossroads did not have valid, perfected liens and security interests as of the Petition Date, including all assets of the Debtor arising Post Petition. The adequate protection replacement liens granted to Crossroads shall be senior in priority to any liens granted to Merchant Coterie.

B. Cash Collateral Usage:

1. Crossroads would consent to the use of cash collateral during the period from the Petition Date through the Maturity Date, based on the Budget attached hereto as <u>Exhibit 5</u>. All Post-Petition collections of Post-Petition accounts receivables will be deposited into deposit accounts (the "DIP Accounts") on which Crossroads would have a first priority lien. These funds in the DIP Accounts, as well as other funds advanced by Crossroads, then will be available to the Debtor to pay for working capital needs in accordance with the Budget.

## **RELIEF REQUESTED**

28. By this Motion, the Debtor requests entry of an Order (i) authorizing it to obtain Post-Petition secured financing pursuant to section 364 of the Bankruptcy Code by entering into the DIP Loans; (ii) authorizing the Debtor to grant Crossroads, subject to the Carve-Out, pursuant to Sections 364(c)(1), 364(c)(2) and 364(d)(1) of the Bankruptcy Code, a first priority, senior, security interest in the Debtor's assets and super-priority administrative expense claim as set forth in the Crossroads DIP Loan Documents; (iii) approving the use of cash collateral pursuant to section 363 of the Bankruptcy Code; and (iv) setting the final hearing on the relief requested herein pursuant to Bankruptcy Rule 4001(c).

HTPL: 740676v3

## BASIS FOR RELIEF REQUESTED

**A. DIP Loans**

29. Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business and (c) obtain credit with specialized priority or with security. If a debtor in possession cannot obtain Post-Petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to a superpriority administrative expense status or is secured by a lien on the debtor's property, or a combination of the foregoing.

30. The evidence at the interim hearing will show that, since substantially all of the Debtor's assets are already encumbered to Crossroads and Merchant Coterie, and given the Debtor's current financial condition, it was not possible for the Debtor to obtain credit on either an unsecured basis, or solely on the basis of granting junior liens. Indeed, the terms proposed by Crossroads represents the only revolving secured inventory financing lender financial package currently available to the Debtor. As will be shown, the potential sources of an adequate DIP Financing for the Debtor, obtainable on an extremely expedited basis and on reasonable terms, were practically nonexistent. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Federal Say. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).

31. A debtor need only demonstrate "by a good faith effort that credit was not available" without the protection of section 364. *Id.* The Debtor believes that the evidence at the interim hearing will satisfy the requirement of section 364 that credit on other terms was not available to the Debtor. Moreover, as pre-petition senior secured lender and now as proposed

HTPL: 740676v3

Case 19-10317    Doc 16    Filed 08/16/19    Entered 08/16/19 17:32:46    Desc Main
Document    Page 15 of 20

post-petition senior secured lender, Crossroads has consented to the superpriority status and liens being provided under the DIP Facility.

32. The Debtor has been unable to obtain adequate secured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or secured credit in the amount and on as favorable terms as are contemplated in the Crossroads DIP Loan Documents.

**B.    Use of Cash Collateral**

33. The Debtor, pursuant to section 363(c)(2) of the Bankruptcy Code, hereby requests authority, immediately and on an ongoing basis, to use cash collateral, including the cash proceeds from the collection of any accounts receivable, to pay the expenses of operating its business and other administrative expenses during the pendency of these case.

34. The Debtor's use of property of the estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the [debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

35. Section 363(c)(2) permits the Debtor in possession to use, sell or lease cash collateral only if either (i) each entity that has an interest in such cash collateral consents; or (ii) the court, after notice and hearing, authorizes such use, sale or lease in accordance with the provisions of this section 11 U.S.C. § 363(c)(2). If the secured creditor does not consent to the use of its cash collateral, the Court can authorize the debtor to use such cash collateral under section 363(c)(2)(B) if the court determines that the Debtor has provided "adequate protection" of the secured creditors' interests. 11 U.S.C. § 363(e). Crossroads has agreed to consent to the use

15

of its cash collateral on the conditions set forth in the Crossroads DIP Loan Documents and the proposed Interim Order.

36. As set forth above, Crossroads, as the pre-petition and proposed post-petition senior secured lender, has consented to the Debtor's use of cash collateral. In accordance with the Merchant Coterie DIP Financing Agreement and the Subordination Agreements, Merchant Coterie has also consented to the Debtor's use of cash collateral.

### C.   Interim Authorization

37. Unless the Debtor obtains emergency approval of its Motion for continuing Court authorization to use cash collateral pursuant to section 363 of the Bankruptcy Code for the purposes requested, the Debtor will suffer immediate, continuing, and irreparable harm.

38. Because of the Debtor's acute liquidity crisis and the impracticability of pursuing and paying for a lengthy due diligence process by other possible lenders, the Debtor has concluded that, in its business judgment, only Crossroads, who is familiar with the Debtor's business operations, corporate structure, financing arrangements and collateral base, would be able to offer a post-petition credit facility to meet the Debtor's immediate working capital needs on the terms, and within the time frame, that the Debtor requires to protect its assets and the enterprise value of its operations.

39. It is beyond contention that the Debtor needs immediate access to additional working capital. As with most businesses, in particular those in the capital-heavy retail space, the Debtor has significant cash needs. Access to substantial credit is necessary to pay payroll, maintain access to the Debtor's numerous locations and to purchase inventory, as well pay other operational costs of the Debtor. Access to sufficient cash is therefore critical to the Debtor's

survival. In the absence of immediate access to cash and credit, the Debtor's suppliers will refuse to supply the product required to maintain operations.

40.     Further, the success of this case depends on the confidence of the Debtor's suppliers, customers, and employees. Approval of the DIP Facility and of the use of cash collateral will assist in providing the confidence to suppliers and employees that the Debtor has access to the cash needed to continue its operations as it pursues a going concern sale process.

41.     The Debtor is confident that it can stabilize its business and maximize the value of the Debtor's assets and business through a sale transaction, and the new money financing and access to capital detailed in this Motion provides the Debtor with its best chance to do so.

42.     Pending the final hearing, the Debtor requires immediate financing and the use of cash collateral for, among other things, the purchase of inventory for its operations, the funding of payroll obligations, the funding of its on-going business operations and other working capital needs. Absent immediate financing and use of cash collateral for its continuing business operations, the Debtor will be unable to pay essential operating expenses and purchase inventory, and therefore, may be unable to continue to conduct its business pending the final hearing on the relief requested herein.

43.     Accordingly, the Debtor, requests that, pending a final hearing, the Court schedule an interim hearing as soon as practicable to consider the Debtor's request for authorization to obtain emergency interim credit under the DIP Loan Documents and for the use of cash collateral.

44.     The Debtor's proposed Interim DIP Financing Order in connection with this Motion is attached hereto as Exhibit 1.

## **NOTICE**

Notice of this Motion has been given to the following parties: (i) the holders of the twenty largest general unsecured claims against Bon Worth; (ii) the Office of the United States Bankruptcy Administrator for the Western District of North Carolina; (iii) counsel for Crossroads and Merchant Coterie; and (iv) Image Solutions, LLC and GreatAmerica Financial Services Corporation, which both filed UCC-1 Financing Statements with the North Carolina Secretary of State against the Debtor. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that the Court:

A.  Conduct an emergency hearing on this Motion in the United States Courthouse at 401 West Trade Street, Charlotte, North Carolina in accordance with sections 105, 361, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014;

B.  At the emergency hearing, determine that the Debtor has given adequate notice of the emergency hearing on the approval of the DIP Financing and the use of cash collateral as to content, persons, and time;

C.  At the emergency hearing, grant the Motion on an emergency basis pending a final hearing;

D.  At the emergency hearing, enter the Interim Order approving the post-petition financing as set forth in the Crossroads DIP Loan Documents on an emergency interim basis for cause shown, including without limitation, (1) authorization of the Debtor to execute and deliver the Crossroads DIP Loan Documents; (2) authorizing the Debtor to draw on the DIP Facility; (3) granting of superpriority administrative expense claim status to the DIP Facility (subject to the Carve-Out); (4) granting to Crossroads automatically perfected first-priority security interests

18

HTPL: 740676v3

(subject to the Carve-Out) in and liens on all of the property, assets or interest in property of the Debtor's estate; and (5) granting Adequate Protection to (i) Crossroads in the form of continuing, first priority, replacement liens on the Collateral and (ii) to Merchant Coterie in the form of junior, subordinate replacement liens on the Collateral;

E.    At the emergency hearing, authorize the Debtor, immediately and on an ongoing basis, to use any and all of the cash proceeds from the DIP Loan or Cash Collateral to pay the ordinary expenses of operating its business and to fund the administrative expenses of this case in accordance with the Budget attached hereto as Exhibit 5;

F.    At the emergency hearing, set this Motion for a final hearing upon due notice, in accordance with sections 105, 361, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014;

G.    Authorize the Debtor to execute the Crossroads DIP Loan Documents in substantially the form attached hereto as Exhibits 2 and 3, and any additional loan documents reasonably necessary to effectuate the terms set forth herein; and

H.    Grant such other and further relief as the Court deems just and proper.

This the 16th day of August, 2019.

          HORACK, TALLEY, PHARR & LOWNDES, P.A.

          /s/ Paul R. Baynard
          Paul R. Baynard
          N.C. State Bar No. 15769
          Amy P. Hunt
          N.C. State Bar No. 34166
          301 S. College Street, Ste. 2600
          Charlotte, NC 28202-6006
          Telephone: 704-377-2500
          Facsimile: 704-714-7935
          E-mail: pbaynard@horacktalley.com
          E-mail: ahunt@horacktalley.com
          *Proposed Counsel to the Debtor*