## EXHIBIT 2

**CREDIT AGREEMENT (Part 1)**

## LOAN AND SECURITY AGREEMENT

This **LOAN AND SECURITY AGREEMENT** is entered into as of February _2_, 2019 by and between Bon Worth, Inc., a North Carolina Corporation (with tax identification # ██████3664), its successors, assigns, and subsidiaries, now owned and in the future (individually or collectively, "Borrower" or "Borrowers"), and **Crossroads Financing, LLC, a Connecticut limited liability company** ("Lender").

### RECITALS

A.    Borrowers have requested that Lender provide financial accommodations to Borrowers as more fully set forth herein and in the Loan Documents.

B.    The Obligations will be guaranteed by Guarantors.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Parties hereby agree as follows:

### AGREEMENT

1.    **Certain Definitions and Index to Definitions**.

1.1    **Accounting Terms**. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP consistently applied.

1.2    **Definitions**. All other terms contained in this Agreement that are not specifically defined herein shall have the meanings provided in the UCC to the extent the same are used herein. All references herein to the singular or plural shall also mean the plural or the singular, respectively. As used herein, the following terms shall have the following meanings:

1.2.1    "Acceptable Forum"– see Section 31.1 hereof.

1.2.2    "Additional Depository Account" – see Section 3.4.5.

1.2.3    "Additional Loan Fee"– see Section 3.6.6 hereof.

1.2.4    "Assurances"– see Section 4.2 hereof.

1.2.5    "Advances" – see Section 2.1.1 hereof.

1.2.6    "Agreement" – this Loan and Security Agreement, together with all exhibits and schedules hereto, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated, or replaced.

1.2.7    "Allowable Amount" – the lesser of (i) the Borrowing Base less the Availability Reserves and (ii) the Maximum Amount.

1.2.8   "Availability Reserves" – as of any date of determination, such amounts as Lender may from time to time reasonably establish and revise reducing the amount of Advances which would otherwise be available to Borrowers hereunder:

(a)    To reflect events, conditions, contingencies or risks which, as determined by Lender, which may affect either (i) the Collateral or any other property which is security for the Obligations or its value, (ii) the assets, business or prospects of Borrowers or any Obligor, or (iii) the security interest and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof);

(b)    In the amount of any Third–Party Claim, until such time as Lender has determined in good faith that the Third Party Claim is unlikely to be asserted;

(c)    To reflect Lender's reasonable belief that any collateral report or financial information furnished by or on behalf of Borrowers or any Obligor to Lender is or may have been incomplete, inaccurate or misleading in any material respect; or

(d)    In respect of any state of facts that Lender determined constitutes an Event of Default or may, with notice or passage of time or both, constitute an Event of Default

1.2.9   "Average Unused Portion of the Maximum Amount" – the Maximum Amount less: (a) the average Advances outstanding during the immediately preceding month; and (b) the Availability Reserves.

1.2.10   "Avoidance Claim" – any claim that any payment received by Lender from or for the account of Borrowers or on account of any Collateral is avoidable under the United States Bankruptcy Code or any other state or federal debtor relief statute.

1.2.11   "Borrowers" – see Preamble hereof.

1.2.12   "Borrowing Base" – the lower of the following, when applied to Eligible Inventory plus Eligible In–Transit Inventory, by Category:

(a)    Up to 70% of Inventory Cost; or

(b)    Up to 85% of Net Orderly Liquidation Value.

1.2.13   "Borrowing Base Certificate" – a request for an Advance, in a form acceptable to Lender, which form may be electronic or hard copy.

1.2.14   "Business Day" – any day which is not a Saturday, Sunday, or other day on which national banks are authorized or required to be closed.

1.2.15   "Cash Collateral Holdback Account" – A non–interest bearing account on the books of the Lender representing the amount of Credit Card Proceeds and other deposits received by Lender, maintained by Lender to ensure Borrowers' compliance with the terms hereof and held by the Lender as cash collateral securing the Obligations.

1.2.16 "Cash Collateral Retention Amount" – Twenty six percent (26%) of Borrowers' total cash, cash, debit card, and credit card sales during the period since Borrowers' last submission of a Borrowing Base Certificate. The Cash Collateral Retention Amount may be changed by Lender in their sole reasonable discretion, but shall never exceed the amount of the Obligations then outstanding. Absent an Event of Default, Lender shall use its best efforts to (a) provide 5 calendar days' notice prior to a change in the Cash Collateral Retention Amount and (b) remit any excess above twenty six percent (26%) constituting the Cash Collateral Retention Amount to Borrower on a daily basis.

1.2.17 "Category" – The Inventory categories as defined by Lender on the Borrowing Base Certificate, including Finished Goods, In–Transit Inventory, and Ineligible Inventory, Work in Process, and any new Inventory category added by Lender following a third party appraisal.

1.2.18 "Change in Law" – Any change in federal, state, local, or foreign applicable statutes, rules, regulations, and orders occurs that would reasonably be expected to prevent the sale or other transfer of Borrowers' Inventory within any or all states of the United States.

1.2.19 "Chosen State" – New York.

1.2.20 "Clearance Days" – Two Business Days for wire and ACH receipts and Five Business Days for check receipts.

1.2.21 "Clearance Day Payments" – payments received by Lender, in whatever form and from whatever source in reduction of the Obligations.

1.2.22 "Collateral" – All Borrowers' present and future Assets, Accounts, Chattel Paper, Goods (including Inventory and Equipment), Instruments, Investment Property, Documents, and General Intangibles, Letter of Credit Rights, Commercial Tort Claims, Deposit Accounts, and the proceeds thereof.

1.2.23 "Collateral Oversight Fee" – 0% per month of the Loan Account balance to compensate Lender for the cost of monitoring the Collateral.

1.2.24 "Complete Termination" – Complete Termination occurs upon satisfaction of the following conditions:

(a)    Payment in full of all Obligations;

(b)    If Lender has issued or caused to be issued guarantees, commitments to third parties or letters of credit on behalf of Borrowers, acknowledgement from any beneficiaries thereof that Lender or any other issuer has no outstanding direct or contingent liability therein.

(c)    Borrowers has executed and delivered to Lender a general release in the form of Exhibit 1.2.24 (c) attached hereto.

1.2.25 "Contractual Termination Date" – The end of the Initial Term or any Renewal Term, as the case may be.

1.2.26 "Credit Accommodation" – any Advance or other extension of credit by Lender to or on behalf of Borrowers hereunder.

1.2.27 "Credit Card Proceeds" – all proceeds of Collateral including but not limited to credit card payments, debit card payments, ACH transfers, wire transfers, cash, or checks.

1.2.28 "Credit Card Sales Percentage" – Initially 100% and thereafter as determined by Lender from time to time, in its sole reasonable discretion.

1.2.29 "Credit Card Sales Percentage Amount" – As of any date of determination, the product of the Credit Card Sales Percentage and the total amount due Borrower by Merchant Processor as of such date.

1.2.30 "Default Interest Rate Spread" – 1% per month.

1.2.31 "Default Rate"– the interest rate otherwise applicable hereunder increased by the Default Interest Rate Spread.

1.2.32 "Default Waiver Fee" – $1,000.00

1.2.33 "Depository Account" – see Section 3.4.4 hereof

1.2.34 "Early Termination Date" – the date on which an Early Termination Event occurs.

1.2.35 "Early Termination Event" – the occurrence of any of the following:

(a) The effective date of termination of this Agreement by Borrowers that is not a Contractual Termination Date;

(b) Borrowers becomes a debtor in a case filed under the United States Bankruptcy Code or any similar state proceeding; or

(c) Borrowers repays or is required to repay the Obligations in full (whether by acceleration or otherwise) prior to the next Contractual Termination Date, other than under than a demand by Lender under Section 3.2.

1.2.36 "Early Termination Fee" – In the event of an Early Termination Event, Borrower shall, upon demand therefor, pay Lender 5% of the Maximum Amount. The Early Termination Fee shall be in addition to any other fees due to Lender hereunder.

1.2.37 "Eligible In–Transit Inventory" – as of any date of determination thereof, without duplication of any Eligible Inventory, In–Transit Inventory:

(a) Subject to Lender's first priority, perfected security interest;

(b)     For which the purchase order is in the name of Borrowers and title has passed to Borrowers;

(c)     Which has been delivered to a carrier in a foreign port or foreign airport for receipt by Borrowers in the United States or which has been delivered to a carrier in the United States for receipt by Borrowers in the United States within 5 Business Days of the date of release by U.S. Customs, but which has not yet been received by Borrowers;

(d)     Which has been in transit for 60 days or less from the date of shipment of such Inventory;

(e)     Which is insured in accordance with the provisions of this Agreement, including cargo insurance; and

(f)     Which is otherwise acceptable to Lender in its sole discretion;

provided that the Lender may, in its sole discretion, exclude any particular Inventory from the definition of "Eligible In–Transit Inventory" in the event the Lender determines that such Inventory is subject to any Person's right or claim which is (or is capable of being) senior to, or pari passu with, the lien of the Lender (such as, without limitation, a right of stoppage in transit) or may otherwise adversely impact the ability of the Lender to realize upon such Inventory.

1.2.38 "Eligible Inventory" – Inventory (including (i) raw material used or consumed by Borrowers in the ordinary course of business in the manufacture or production of other Inventory (ii) Work in Process and (iii) Finished Goods) of Borrowers which is:

(a)     Subject to Lender's first priority, perfected security interest;

(b)     In Borrowers' possession and control and situated at a location in compliance with this Agreement;

(c)     Valued at the lower of cost or market, and

(d)     Otherwise acceptable to Lender in its sole reasonable discretion.

1.2.39 "Event of Default" – see Section 12 hereof.

1.2.40 "Factor" – Any entity that agrees, pursuant to a factoring agreement or otherwise, to purchase the Accounts of Borrowers or lend against estimated future credit card sales.

1.2.41 "Factoring Documents" – NA.

1.2.42 "Finished Goods" – Inventory that is ready for sale or shipment to Borrowers' customers.

1.2.43 "GAAP" – means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of

Certified Public Accountants and pronouncements of the Financial Accounting Standards Board (or any successor authority) that are applicable as of the date of determination.

1.2.44  "Guarantors" – all individuals and entities now or hereafter guaranteeing the Obligations, but not including Validity Guarantees by Nick Dmytryszyn and Gurumoorthy Gurusankar.

1.2.45  "In–Transit Inventory" – Inventory owned by Borrowers that is in transit to Borrowers or an agent or contractor of or for Borrowers.

1.2.46  "Ineligible Inventory" – Inventory of Borrowers that is not Eligible Inventory or Eligible In–Transit Inventory.

1.2.47  "Initial Term" – 1 year from the date hereof.

1.2.48  "Interest Rate" – a per annum rate equal to the greater of (i) the three–month LIBOR rate plus 3.2% or (ii) 6%.

1.2.49  "Inventory Cost" – As determined by Lender, the lesser of (a) cost of Eligible Inventory or Eligible In–Transit Inventory, as applicable, computed in accordance with GAAP, or (b) the market value of Eligible Inventory or Eligible In–Transit Inventory, as applicable, as established by a third party valuation firm acceptable to Lender.

1.2.43.1  "Key Employees" – Nick Dmytryszyn and Gurumoorthy Gurusankar.

1.2.50  "Late Fee"– means 5% of the amount of any payment of principal, fees, interest or any other amount due hereunder.

1.2.51  "Loan Account" – that portion of the Obligations which accrue interest hereunder, including the sum of the unpaid balances of:

(a)  Advances;

(b)  Other payments made by Lender arising hereunder for which Borrowers is liable to Lender;

(c)  Unpaid fees, interest or expenses due hereunder.

1.2.52  "Loan Documents" – this Agreement, together with any documents, instruments and agreements, executed and/or delivered in connection herewith, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.2.53  "Loan Fee" – The Loan Fee Percent multiplied by the Maximum Amount at the time this fee is earned.

1.2.54  "Loan Fee Percent"– 2% annually.

1.2.55  "Maturity Fee" – means 5% of the amount of Obligations which remain

unpaid and outstanding after the Termination Date.

      1.2.56 "Maximum Amount" – $1,000,000

      1.2.57 "Merchant Processor" – An entity acceptable to Lender, that agrees, pursuant to a Merchant Processing Agreement or otherwise, to process the credit card, debit cards, or other sales of Borrowers and direct the Credit Card Sales Percentage or other proceeds of such sales to Lender pursuant to a tri–party agreement acceptable to Lender.

      1.2.58 "Merchant Processing Agreement" – The agreement between Merchant Processor and Borrowers pursuant to which Merchant Processor agrees to process all electronic payments including credit and debit cards and agrees to remit such amounts only to Lender, together with all other documents executed in connection therewith.

      1.2.59 "Minimum Advance" – $10,000.00

      1.2.60 "Minimum Monthly Fee" –$7,500.

      1.2.61 "Net Orderly Liquidation Value" – The value of Eligible Inventory or Eligible In–Transit Inventory, as applicable, as determined by Lender in the exercise of its reasonable sole discretion, which could be obtained upon liquidation under distress conditions.

      1.2.62 "Obligor" – the Borrowers or any Guarantor, other than the Validity Guarantors.

      1.2.63 "Obligations" – all present and future obligations owing by Borrowers to Lender whether arising hereunder or otherwise and whether arising before, during or after the commencement of any bankruptcy case in which Borrowers is a Debtor.

      1.2.64 "Over Advance Fee" – a fee of 0.25% of the amount by which the Obligations exceed the Allowable Amount for each day that the Obligations exceed the Allowable Amount, with a minimum Over Advance Fee of $25.00 per day.

      1.2.65 "Parties" – Borrowers and Lender.

      1.2.66 "Prime Rate" – for any day, the highest rate of interest quoted in the immediately preceding calendar month by The Wall Street Journal as the "Prime Rate" in the United States of America or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Board of Governors of the Federal Reserve System of the United States of America in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Lender in its sole discretion) or any similar release by the Board of Governors (as determined by Lender in its sole discretion). "Renewal Term" – one year.

      1.2.67 "Service Fee" – 1% per month of the Loan Account balance.

      1.2.68 "Subordinating Creditor" – any creditor of the Borrowers which has

executed a Subordination Agreement.

1.2.69 "Subordination Agreement" – a subordination agreement in form and substance acceptable to Lender whereby a Subordinating Creditor subordinates, in favor of Lender, obligations owed to it by Borrowers.

1.2.70 "Termination Date" – the earlier of (i) the Contractual Termination Date or (ii) the date on which Lender elects to terminate this Agreement pursuant to the terms herein, or (iii) the Early Termination Date.

1.2.71 "Third Party Claim" – claims asserted against Lender by any person or entity relating in any way to the Lender's relationship with Borrowers.

1.2.72 "UCC" – The Uniform Commercial Code in effect in the Chosen State at the date on which a determination thereunder is to be made.

1.2.73 "Unused Line Fee" – one percent per annum of the Average Unused Portion of the Maximum Amount.

1.2.74 "Validity Guarantors" – Nick Dmytryszyn and Gurusankar Gurumoorthy.

1.2.75 "Work In Process" – Borrowers' partially finished Inventory.

2.    **Credit Facilities.**

2.1    **Advances.** Subject to the terms and conditions of this Agreement, from the date on which this Agreement becomes effective until the Termination Date:

2.1.1    Lender, may, from time to time in its sole discretion, make advances ("Advances") to Borrower at Borrower's request, so long as, before and after such Advance, the Obligations do not exceed the Allowable Amount. The fact that the Borrower is bound to various covenants herein, the breach of which may allow Lender to accelerate the due date of Borrower's Obligations hereunder, shall not be construed to constitute a commitment by Lender to make any Advances hereunder, all of which are in the sole discretion of Lender.

2.1.2    Lender may, in its discretion, from time to time, upon not less than 5 days prior notice to Borrowers, reduce the amount available under the Borrowing Base to the extent that Lender determines that the number of days of the turnover of the Inventory for any period has changed in any material respect, or the nature and quality of the Inventory has deteriorated.

2.2    **General Provisions.**

2.2.1    Borrowing Base Certificate. Each request from Borrowers for a Credit Accommodation, but no less than once per week, shall be accompanied by a Borrowing Base Certificate, completed and signed by Borrowers. Such Borrowing Base Certificate may be in either electronic or hard copy form, as acceptable to Lender. The Borrowing Base Certificate shall at all times be a bona fide and accurate representation of the Collateral and Advances and comply with the representations and warranties herein.

2.2.2 <u>Crediting Borrowers' Account</u>. All Credit Accommodations by Lender may be made by deposits or transfers to the designated deposit account of Borrowers.

2.2.3 <u>Authorization for Credit Accommodations</u>. Subject to the terms and conditions of this Agreement, Lender is authorized to make Credit Accommodations:

(a) Upon telephonic, facsimile, electronic or other instructions received from anyone purporting to be an officer, employee or representative of Borrowers; or

(b) At the sole discretion of Lender, and notwithstanding any other provision in this Agreement, if necessary to meet any Obligations, including but not limited to any interest not paid when due.

3. <u>**Payments by Borrowers**</u>.

3.1 <u>**In General**</u>

3.1.1 <u>Place of Payments</u>. All payments hereunder shall be made by Borrowers to Lender at Lender's address set forth herein or at such other place as Lender may designate in writing.

3.1.2 <u>ACH Debits</u>. In order to satisfy any of the Obligations, Lender is hereby authorized by Borrowers to initiate electronic debit entries through the ACH or other electronic payment system to any account maintained by Borrowers. Upon Lender's request at any time, Borrowers shall execute and deliver to Lender an authorization agreement for ACH debits.

3.1.3 Borrowers irrevocably waives the right to direct the application of any and all payments received at any time by Lender from or on behalf of Borrowers and specifically waives any right to designate application of payments. However, Borrowers irrevocably agrees that Lender shall have the exclusive right to determine the order and method of the application of payments against the then due and payable Obligations of Borrowers in Lender's sole discretion and to revise such application prospectively or retroactively in Lender's sole discretion.

3.2 <u>**Demand Obligation**</u>. Notwithstanding anything to the contrary contained herein, and notwithstanding that this Agreement contains covenants, conditions and Events of Default, Borrowers shall pay to Lender, on demand, the Loan Account balance.

3.3 Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate permitted by applicable law ("Maximum Rate"). If Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the loans hereunder or, if it exceeds such unpaid principal, refunded to Borrowers. In determining whether the interest contracted for, charged, or received by Lender exceeds the Maximum Rate, Lender may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

3.4 **Merchant Processing Agreement; Depository Bank Account; Cash Collateral Holdback Account**.

3.4.1 During the term of this Agreement, Borrowers shall maintain a processing relationship for all its credit card and debit card sales with Merchant Processor. The Borrower shall not change or add a new Merchant Processor without the prior written consent of Lender and such Merchant Processor must be subject to a tri–party agreement acceptable to Lender.

3.4.2 Borrowers and Merchant Processor have entered into the Merchant Processing Agreement, pursuant to which Merchant Processor will process the Borrowers' electronic cash receipts including but not limited to credit card receipts and debit card receipts, and Borrower shall be at all times in full compliance with the terms of the Merchant Processor Agreement. Borrower shall immediately notify Lender of a default under the Merchant Processor Agreement.

3.4.3 In the event of a change of the Credit Card Sales Percentage by Lender, Borrower authorizes Lender to instruct Merchant Processor to change the Credit Card Sales Percentage and/or upon Lender's approval in writing, Borrowers will instruct Merchant Processor to change the Credit Card Sales Percentage.

3.4.4 Borrowers shall cause the Credit Card Sales Percentage Amount to be transferred daily into a bank account in the name of the Lender as specified by the Lender ("Depository Account"). Borrowers shall not change remittance instructions to the Merchant Processor without the prior written consent of Lender and shall not in any way interfere with the notification or remittance instructions provided by Lender to Merchant Processor.

3.4.5 Any payments received by Borrowers as proceeds of any Collateral including cash and American Express payments shall be immediately deposited into the Depository Account or accounts as may be designated by Lender in writing (collectively, the "Additional Depository Accounts"). Borrowers acknowledge the Depository Account, or Additional Depository Accounts are the property of Lender, and Borrowers shall make no claim to, or in any way interfere with, the Depository Account or Additional Depository Accounts.

3.4.6 Any amounts that are received by Lender in the Depository Account or Additional Depository Accounts prior to 12:00 eastern time, and provided Borrower is not in Default of this Agreement, shall be remitted by Lender by ACH or wire transfer to Borrower after deducting the Cash Collateral Retention Amount, less any other amounts that may be otherwise due Lender pursuant to this Agreement.

3.4.7 All Cash Collateral Retention Amounts retained by the Lender pursuant to Section 3.4.6 shall be applied to the Cash Collateral Holdback Account.

3.4.8 Upon receipt of a Borrowing Base Certificate from Borrowers, amounts in the Cash Collateral Holdback Account may be applied by the Lender to the Obligations of Borrower so that the Loan Account balance does not exceed the Allowable Amount. Provided no Event of Default has occurred, Lender shall pay to Borrowers up to the remaining balance of the Cash Collateral Holdback Account from time to time, or, in the event of the occurrence of an Event of Default, Lender shall retain an amount as determined by the Lender in its sole

discretion, as a cash reserve. All payments to be made to Borrowers under this Section shall be made by deposits or transfers to any demand deposit account of Borrowers at Borrower's expense. Borrowers understand and agree that no interest is payable to the Borrowers on the funds in the Cash Collateral Holdback Account.

3.4.9    Lender shall be entitled to retain the Cash Collateral Holdback Account until Complete Termination.

3.4.10    Borrowers shall provide Lender with a daily sales report showing all of its cash receipts, together with such back up documentation as Lender may reasonably request. Borrowers shall also provide Lender with a reconciliation of cash receipts to its sales and Inventory reports.

3.4.11    Lender is authorized to debit the Loan Account for interest, fees and other charges due Lender hereunder as and when due.

3.5    **Interest**.

3.5.1    Subject to subsection 3.5.2 below, interest on the Loan Account balance shall be payable monthly, in arrears, shall be computed at the Interest Rate computed on the basis of a 360 day year, and shall be due and payable on the first day of each month following the prior calendar month.

3.5.2    Default Interest. Immediately upon the occurrence of an Event of Default, the interest rates otherwise applicable shall be increased to the Default Rate.

3.6    **Fees**.

3.6.1    Field Exam Fee. Borrowers shall immediately pay to Lender, Lender's reasonable out–of–pocket expenses in connection with each field examination Lender performs or causes to be performed hereunder.

3.6.2    Collateral Oversight Fee. Borrowers shall pay the Servicing Fee to Lender monthly, prorated for partial months, in arrears, on the first day of each month following the accrual thereof.

3.6.3    Default Waiver Fee. Borrowers shall pay the Default Waiver Fee to Lender, immediately upon the waiver by Lender of any Event of Default hereunder, so long as the waiver was done at the Borrowers' request.

3.6.4    Early Termination Fee. Borrowers shall pay to Lender the Early Termination Fee immediately upon the occurrence of an Early Termination Event. In addition, in the event that payment of the Obligations shall be accelerated for any reason whatsoever by Lender, the Early Termination Fee in effect as of the date of such acceleration shall be charged to Borrower on such date and such Early Termination Fee shall also be added to the outstanding balance of the Obligations in determining the payoff amount or the debt for the purposes of any judgment of foreclosure of any loan documents given to secure the Obligations. .

3.6.5 <u>Loan Fee</u>. On the date hereof and upon each annual anniversary of the date hereof until Complete Termination has occurred, Borrower shall pay to Lender the Loan Fee. Each such loan Fee shall be fully earned when due in accordance with the preceding sentence and shall be nonrefundable. All Loan Fees otherwise payable for the Initial Term shall be accelerated and immediately due and payable upon the occurrence of an Event of Default or upon termination of this Agreement by Borrower.

3.6.6 <u>Additional Loan Fee</u>. Immediately upon any increase in the Maximum Amount, Borrowers shall pay to Lender a fee computed as the product of the Loan Fee Percent and the amount of the increase in the Maximum Amount.

3.6.7 <u>Service Fee</u>. Borrower shall pay the Service Fee to Lender monthly, prorated for partial months, in arrears, on the first day of each month following the accrual thereof.

3.6.8 <u>Minimum Monthly Fee</u>. Borrowers shall pay to Lender any amount by which the sum of the interest and Servicing Fee earned in any month (prorated for partial months) is less than the Minimum Monthly Fee, on the first day of the following month.

3.6.9 <u>Attorneys' Fees</u>. Borrowers shall pay to Lender all reasonable attorneys' fees and costs incurred in preparation of this Agreement and related documents. All such legal fees shall be based upon the usual and customary rates for services actually rendered and not upon any fixed percentage of the outstanding balance hereunder.

3.6.10 <u>Standard Fees</u>. Borrowers shall pay to Lender wire fees, and any other out of pocket direct expenses including but not limited to search fees, legal fees subject to Section 3.6.9, appraisals, and other reasonable costs and expenses paid to preserve collateral. Lender shall have the right to charge all or any of such fees upon ten days' notice to Borrower.

3.6.11 <u>Late Fee</u>. Borrowers shall pay to Lender the Late Fee for each payment of principal, fees or interest or any other amount due hereunder which is not paid within 5 days of its due date (or any check that does not clear), to cover the extra expense involved in handling delinquent payments, provided that collection of said Late Fee shall not be deemed a waiver by Lender of any of its other rights under this Agreement or any other instrument given to secure this indebtedness. The Borrowers and Lender hereby agree that said fee is a fair and reasonable charge for the late payment and shall not be deemed a penalty. Additionally, Lender may exercise any and all other rights and remedies Lender has as outlined herein or in the other loan documents that secure the loan described herein.

3.6.12 <u>Maturity Fee</u>. Borrowers shall pay to Lender the Maturity Fee on the first day of each month in the event that any Obligations remain outstanding after the Termination Date, to cover the extra expense involved in handling a matured loan, provided that collection of said Maturity Fee shall not be deemed a waiver by Lender of any of its other rights under this Agreement or any other instrument given to secure this indebtedness. The Borrowers and Lender hereby agree that said fee is a fair and reasonable charge for the failure to repay the Obligations on the Termination Date and shall not be deemed a penalty. Additionally, Lender may exercise any and all other rights and remedies Lender has as outlined herein or in the other

loan documents that secure the loan described herein. The Maturity Fee shall be in addition to all other fees due to the Lender.

      3.6.13 <u>Over Advance Fee</u>. Borrowers shall pay to Lender the Over Advance Fee for each day that the Obligations exceed the Allowable Amount.

      3.6.14 <u>Misdirected Payment Fee</u>. Borrowers shall pay to Lender a misdirected payment fee in the amount of fifteen percent of the amount of any payment received by Borrowers from a customer or account debtor that is not remitted to the Lender, the Depository Account or an Additional Depository Account, as the case may be, on the day following the date of receipt by Borrowers.

      3.6.15 <u>Application of Collections</u>. Lender shall, for the purpose of the computation of interest and the Servicing Fee due hereunder, add the Clearance Days to any Clearance Day Payments, which is acknowledged by the Parties to constitute an integral aspect of the pricing of Lender's facility to Borrowers, and shall apply irrespective of the characterization of whether receipts are owned by Borrowers or Lender. Should any check or item of payment not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment, and interest shall be recalculated accordingly.

      3.6.16 <u>Unused Line Fee</u>. Borrower shall pay the Unused Line Fee to Lender on the first day of each month during the term of this Agreement.

4.    **Indemnification Protection**.

    4.1    Notwithstanding payment in full of the Obligations and termination of this Agreement, in the event that (i) a Third Party Claim has been asserted against Lender, or (ii) Lender believes in good faith  that a Third Party Claim may be asserted against Lender, Lender may retain its security interest or any funds of Borrowers in the amount of the Third Party Claim together with Lender's good faith estimate of its costs to be incurred in the defense thereof, until such time as the Third Party Claim is withdrawn or satisfied, unless Lender receives Assurances (as defined below) regarding its exposure to the Third Party Claim.

    4.2    For the purposes hereof, "Assurances" shall mean additional collateral, a guaranty, an indemnity or a letter of credit from an entity so that Lender reasonably believes in good faith that the likelihood of loss resulting from the Third Party Claim is remote.

5.    **Grant of Security Interest**.

    5.1    To secure the performance of the Obligations, Borrowers grants to the Lender a security interest in the Collateral, and all proceeds and products thereof.

6.    **Authorization to File Financing Statements**.

    6.1    The Borrowers irrevocably authorizes the Lender to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that:

      6.1.1 Indicate the Collateral as all assets of the Borrowers or words of similar

effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail;

6.1.2   Contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrowers is an organization, the type of organization, and any organization identification number issued to the Borrowers and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral to be as–extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates;

6.1.3   Contain a notification that the Borrowers have granted a negative pledge to the Lender, and that any subsequent lien holder may be tortiously interfering with Lender's rights;

6.1.4   Advises third parties that any notification of Borrowers' Account Debtors will interfere with Lender's collection rights.

6.2   The Borrowers agrees to furnish any of the foregoing information to the Lender promptly upon request;

6.2.1   The Borrowers ratifies its authorization for the Lender to have filed any initial financing statements or amendments thereto if filed prior to the date hereof; and

6.2.2   The Lender may add any supplemental language to any such financing statement as Lender may determine to be necessary or helpful in acquiring or preserving rights against third parties.

7.   <u>Representations and Warranties by Borrowers</u>.

7.1   Except as set forth on Exhibit 7.1, there are no actions or proceedings pending by or against Borrower or its officers and Guarantors before any court or administrative or regulatory agency and Borrower does not have knowledge or belief of any pending, threatened, or imminent litigation, governmental investigations, or claims, complaints, actions, or prosecutions involving Borrower, officer or any Guarantor of the Obligations, except for ongoing collection matters in which Borrower is the plaintiff.

7.2   All financial statements relating to Borrower that have been delivered by Borrower to Lender have been prepared in accordance with GAAP and fairly present Borrower's financial condition as of the date thereof and Borrower's results of operations for the period then ended.  There has not been a material adverse change in the financial condition of Borrower since the date of the latest financial statements submitted to Lender on or before the date hereof.

7.3   Borrower agrees to maintain accurate books and records and its records pertaining to the Collateral in accordance with GAAP and in such such detail, form and scope, as Lender shall reasonably require.

7.4   Borrower certifies that, to the best of Borrower's knowledge, Borrower has not been designated, and is not owned or controlled, by a "suspected terrorist" as defined in

Executive Order 13224. Borrower hereby acknowledges that Lender seeks to comply with all applicable laws concerning money laundering and related activities. In furtherance of those efforts, Borrower hereby represents, warrants and agrees that: (i) none of the cash or property that Borrower will pay or will contribute to Lender has been or shall be derived from, or related to, any activity that is deemed criminal under United States law; and (ii) no contribution or payment by Borrower to Lender, to the extent that they are within Borrower's control shall cause Lender to be in violation of the United States Bank Secrecy Act, the United States International Money Laundering Control Act of 1986 or the United States International Money Laundering Abatement and Anti–Terrorist Financing Act of 2001. Borrower shall promptly notify Lender if any of these representations ceases to be true and accurate. Borrower shall provide Lender any additional information regarding Borrower that Lender deem necessary or convenient to ensure compliance with all applicable laws concerning money laundering and similar activities. Borrower understands and agrees that if at any time it is discovered that any of the foregoing representations are incorrect, or if otherwise required by applicable law or regulation related to money laundering similar activities, Lender may undertake appropriate actions to ensure compliance with applicable law or regulation, including but not limited to segregation and/or redemption of Lender' investment in Borrower. Borrower further understands that Lender may release confidential information about Borrower and, if applicable, any underlying beneficial owners, to proper authorities if Lender, in its sole discretion, determines that it is in the best interests of Lender in light of relevant rules and regulations under the laws set forth in subsection (ii) above.

7.5    Borrower is a corporation, validly formed, existing in the State of North Carolina, and is in good standing under the laws of the State of North Carolina and is properly licensed and authorized to operate its business in any other jurisdiction in which it conducts business. Borrower's organizational identification number assigned by the above state is 0016369. Borrower's taxpayer identification number for Federal Income Tax purposes is 56–093664. The undersigned signatory on behalf of Borrower represents that he or she has full power and authority to execute this Agreement and bind Borrower hereto.

7.6    The execution, delivery and performance by Borrower of this Agreement and all agreements and documents described herein does not constitute a violation of any law, regulation, judgment, order, contract, charter, by–laws, or other instrument to which Borrower is a party or is otherwise bound or subject.

7.7    Borrower is not in default under any loan agreement, mortgage, trust deed, or similar agreement relating to the borrowing of money to which Borrower is a party or is otherwise bound.

7.8    **RESERVED.**

7.9    **RESERVED.**

7.10    Borrower has entered into the Merchant Processing Agreement, a copy of which has been provided to Lender. The Merchant Processing Agreement is in full force and effect and no default exists or is threatened with respect thereto. All payments due to Borrower under the Merchant Processing Agreement have been duly and validly assigned by Borrowers to Lender.

7.11    Each and every document, statement, record, book, account, and invoice, and all information, whether financial or otherwise, provided to Lender by Borrower, whether heretofore or hereinafter, shall be true, accurate and correct in all material respects.

7.12    Borrower has not transferred, pledged or granted a security interest in its assets, or any of them, which Borrower has not listed in Exhibit 7.12 attached hereto.

7.13    Borrower shall notify Lender immediately upon becoming aware of any issue that may materially affect the value or condition of any Inventory.

7.14    Borrower's Inventory is:

7.14.1    owned by the Borrower free and clear of all encumbrances, except for encumbrances listed on Exhibit 7.14.1 attached hereto and is subject to either a subordination or another intercreditor agreement acceptable to Lender;

7.14.2    except with respect to In–Transit Inventory, at all times at a location under the control of the Borrower and such location(s) are listed in Exhibit 7.14.2 attached hereto;

7.14.3    reported to Lender at the lower of cost or market value including reserves for obsolescence or slow moving Inventory as would otherwise be required under GAAP;

7.14.4    in salable condition as is and ready for shipment; and

7.14.5    not subject to any license agreement except as disclosed to Lender in writing.

8.    **Authorization to Lender**.

8.1    The Borrower irrevocably authorizes Lender to take any and all appropriate action and to execute any and all documents and instruments, in the name of Borrower, that may be necessary or desirable to accomplish the purposes of this Agreement including the filing on behalf of Borrower:

(a)    With such governmental authorities as are appropriate such documents (including, without limitation, applications, certificates, and tax returns) as may be required for purposes of having Borrower qualified to transact business in a particular state or geographic location.

(b)    Any statement under Section 9–518 of the UCC that Lender reasonably deems necessary to preserve its rights hereunder.

(c)    With any third party whose premises is used to store Inventory.

8.2    **RESERVED**.

8.3    Borrower authorizes Lender to accept, endorse and deposit on behalf of Borrower any checks tendered by an account debtor "in full payment" of its obligation to Borrower.

Borrower shall not assert against Lender any claim arising therefrom, irrespective of whether such action by Lender effects an accord and satisfaction of Borrowers' claims, under Section 3–311 of the UCC, or otherwise.

9. **Power of Attorney.**

9.1     Borrower irrevocably appoints Lender, or any person(s) designated by Lender, as its attorney–in–fact, which appointment is coupled with an interest and shall remain in full force and effect until all Obligations of Borrower to Lender have been fully satisfied and discharged, with full power, at Borrowers' sole expense, to exercise after an Event of Default at any time in Lender's discretion all or any of the following powers:

9.1.1   Receive, take, endorse, assign, deliver, accept and deposit, in the name of Lender or Borrower, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof;

9.1.2   Change Borrower's address on all invoices and statements of Account mailed or to be mailed to Borrower's customers and to substitute thereon the designated address;

9.1.3   Receive and open all mail addressed to Borrower, or to Borrower's trade name at Lender's address, or any other designated address;

9.1.4   Take or bring, in the name of Lender or Borrower, all steps, actions, suits, or proceedings deemed by Lender necessary or desirable to effect collection of other realization upon the Collateral;

9.1.5   Create a "doing business as" entity (a "d/b/a") with a name similar to Borrower and open any deposit accounts under such name;

9.1.6   Execute on behalf of Borrower any UCC–1 and/or UCC–3 Financing Statement(s) and/or any notices or other documents necessary or desirable to carry out the purpose and intent of this Agreement, and to do any and all things reasonably necessary and proper to carry out the purpose and intent of this Agreement;

9.1.7   Change the address for delivery of Borrower's mail to Lender and to receive and open mail addressed to Borrower;

9.1.8   Endorse and take any action with respect to bills of lading covering any Inventory;

9.1.9   Prepare and deliver invoices to Borrower's customers, in the name of Lender or Borrower;

9.1.10  Execute, file and serve, in its own name or in the name of Borrower, mechanics lien or similar notices, or claims under any payment or performance bond for the benefit of Borrower; and

9.1.11  Pay any sums necessary to discharge any lien or encumbrance which is

senior to Lender's security interest in the Collateral, which sums shall be included as Obligations hereunder, and which sums shall accrue interest at the Default Rate until paid in full.

9.2     Release.  Borrower hereby release and exculpate Lender, its officers, employees, agents, designees, attorneys, and accountants from any liability from any acts under this Agreement or in furtherance thereof, whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for gross negligence or willful misconduct.  In no event shall Lender have any liability to Borrowers for lost profits or other special or consequential damages.

10.     **Affirmative Covenants**.

10.1     Until full payment of the Obligations and Complete Termination of this Agreement, Borrower shall:

10.1.1 At such times as Lender may request and in the manner specified by Lender, Borrower shall deliver to Lender original invoices, agreements, proof of rendition of services and delivery of goods and other documents evidencing or relating to the transactions which gave rise to any of the Collateral, together with customer statements, schedules describing the Collateral and confirmatory assignments to Lender thereof, in form and substance satisfactory to Lender, and duly executed by Borrower.

10.1.2 At all times, Borrower shall be obligated to maintain its merchant processing relationship with Merchant Processor at all times during the term this Agreement, process all credit card and debit card sales to the Merchant Processor, except American Express, Discover and any other merchant processor as agreed by Lender, and remit the proceeds of all Collateral including but not limited to all proceeds from the sale of Inventory pursuant to the written instructions provided by Lender from time to time. Borrower shall at all times be in full compliance with the terms of the Merchant Processing Agreement and Borrower shall immediately advise Lender, in writing, of the assertion of any Third–Party Claim to the proceeds due Borrower pursuant to the Merchant Processing Agreement.

10.1.3 Immediately advise Lender, in writing, of the assertion of any Third–Party Claim.

10.1.4 Each Borrower shall furnish to Lender, in form and substance reasonably satisfactory to Lender:

(a)     Weekly, a perpetual Inventory report summarizing all Inventory, including a detailed synopsis and description of the Inventory warehoused by Borrower at the time the report is generated.

(b)     Weekly, a perpetual Inventory report summarizing all Inventory by location (if more than one location is applicable), including a detailed synopsis and description of the Inventory warehoused by Borrower at the time the report is generated.

(c)     If applicable and upon request and delivered by email, copies of any reports provided by Borrower to Factor or Factor to Borrower under the Factoring

Agreement and such other reporting regarding Accounts, as Lender may request from time to time.

(d)     Delivered by email, copies of any reports provided by Borrower to Merchant Processor or Merchant Processor to Borrower under the Merchant Processing Agreement and such other reporting regarding Accounts and/or credit card receipts, as Lender may request from time to time.

(e)     Upon request by Lender, a slow moving Inventory report or Inventory aging.

(f)     Upon request by Lender, Inventory reports by SKU that show prior period quantity and dollar value sales, selling price, and other information as may reasonably be requested by Lender;

(g)     The earlier of 120 days or as soon as possible after the end of each fiscal year of Borrower:

(i)     A complete copy of Borrower's financial statements internally prepared, including but not limited to (a) the management letter, if any, (b) the balance sheet as of the close of the fiscal year, and (c) the income statement for such year, together with a statement of cash flows, prepared by a Borrower;

(ii)     Upon request by Lender, a statement certified by the chief financial officer of Borrower that Borrower is in compliance with all the terms, conditions, covenants and warranties of this Agreement;

(iii)     A physical count of all of Borrower's Inventory taken by Borrower or other third party acceptable to Lender.

(h)     Tax Returns. Copies of each Borrower's

(i)     Federal income tax returns, and any amendments thereto, within ten days of the filing thereof with the Internal Revenue Service;

(ii)     Federal payroll tax returns immediately upon request of Lender, together with proof, satisfactory to Lender, that all taxes have been paid; and

(iii)     State sales tax report showing taxes due and paid for each state in which Borrower conducts business, upon request of Lender, in a monthly spreadsheet form that shows all amounts owing by Borrower.

(i)     Copies of the following for each Guarantor, other than a Validity Guarantor:

(i)     Federal income tax returns upon request of Lender;

(ii)      Annual financial statements within thirty days of the end of each calendar year;

(j)      As soon as available but not later than 30 days before the end of each fiscal year of Borrower, an annual operating budget (including monthly balance sheet, statement of income and retained earnings, and statement of cash flows), for the following fiscal year, along with a comparison to the prior year;

(k)      No later than 30 days after the close of each month (an Accounting Period") Borrower's balance sheet as of the close of such Accounting Period and its income statement for such Accounting Period and year to date, in each case setting forth in comparable form, as applicable, the figures for the corresponding Accounting Period for the previous fiscal year, certified by Borrower's chief financial officer as being complete, correct, and fairly representing its financial condition and results of operations.

(l)      <u>Inventory Reports</u>. A listing of all Borrower's Inventory, based upon a physical count taken by Borrower in accordance with Section 10.1.4(g)(iii) and a slow moving Inventory report or Inventory aging upon request by Lender.

10.1.5  <u>Inspections</u>.

(a)      During usual business hours, permit Lender, without notice to Borrower after the occurrence of an Event of Default, and with five business days' prior notice absent an Event of Default, to periodically:

(b)      Have access to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral,

(c)      To inspect, examine, make copies of, and make extracts from Borrower's records as Lender may reasonably request,

(d)      To have a third party selected by Lender examine and inspect the Collateral, at the sole cost of Borrower based on prevailing market rates.

(e)      Without expense to Lender, but without interfering with Borrower's ordinary course of business, Lender may use any of Borrower's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Lender, in its sole discretion, deems appropriate.

10.1.6  <u>Indemnification</u>. Indemnify and save Lender harmless from any and all liability with respect to any Third Party Claim, including the reasonable costs incurred in the defense thereof.

10.1.7  <u>Enforcement of Judgments</u>. Reimburse Lender for all costs and expenses, including reasonable attorneys' fees, which Lender incurs in enforcing any judgment rendered in connection with this Agreement. All such legal fees shall be based upon the usual and

customary rates for services actually rendered and not upon any fixed percentage of the outstanding balance hereunder. This provision is severable from all other provisions hereof and shall survive, and not be deemed merged into, such judgment.

### 10.1.8 Taxes and Expenses Regarding Borrower's Assets.

(a)     Make timely payment when due without extension of all taxes, assessments or contributions required of Borrower. If Borrower fails to make any such payment or deposit or furnish proof of such payment immediately upon Lender's request, Lender may, in its sole discretion and without notice to Borrower:

(i)     Make payment of the same or any part thereof; or

(ii)     Set up such reserves against the Collateral or Obligations as Lender deems necessary to satisfy the liability therefore, or both.

(b)     Lender may conclusively rely on statements of the amount owing or other official statements issued by the appropriate governmental agency. Any payment made by Lender shall constitute neither:

(i)     An agreement by Lender to make similar payments in the future; nor

(ii)     A waiver by Lender of any default under the Loan Documents. Lender need not inquire into, nor contest the validity of, any expense, tax, security interest, encumbrance or lien, and the receipt of the usual official notice requiring the payment thereof shall be conclusive evidence that the same was validly due and owing.

### 10.1.9 Change of Address, State of Organization, or Name

(a)     Borrower shall give Lender written notice:

(i)     Prior to forming a new entity either as subsidiary, affiliated through common ownership, or of similar name;

(ii)     Prior to changing any address of the Borrower that is the Executive Office of Borrower or that contains Collateral;

(iii)     Prior to changing its state of organization of the Borrower;

(iv)     Prior to changing the form of business organization or legal status of the Borrower;

(v)     Upon knowledge that a Guarantor, shareholder, director, member, officer, employee, or relative thereof, of Borrower has formed a new entity to compete with Borrower.

### 10.1.10 Maintenance of Insurance.

(a)     The Borrower will maintain with financially sound and reputable insurers, insurance reasonably acceptable to Lender with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas.  Such insurance shall be in such minimum amounts, but no case less than the Advances made by Lender, that the Borrowers will not be deemed a co–insurer under applicable insurance laws, regulations, and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Lender.  In addition, all such insurance shall be payable to the Lender under a lender loss payable endorsement.  Without limiting the foregoing, the Borrowers will:

(i)     Keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood coverage and earthquake coverage and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property;

(ii)     Maintain all such workers' compensation or similar insurance as may be required by law; and

(iii)     Maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death, or property damage occurring, on, in or about the properties of the Borrower; business interruption insurance; and product liability insurance.

(b)     In the event that Borrower fails to maintain such insurance, Lender may obtain such insurance at Borrower's expense, and, after an Event of Default, to adjust or settle any claim or other matter under or arising pursuant to such insurance or to amend or cancel such insurance.

10.1.11 Electronic Access.  Borrower hereby permits Lender at any time to access electronically information concerning any accounts maintained by Borrower with any bank or other financial institution so long as such access is in furtherance of, or to monitor compliance with, the terms of this Agreement, and Borrower shall provide Lender with all necessary access codes, passwords and the like to carry out the provisions hereof.

10.2     [Intentionally Omitted].

10.3     In the event any payments that are the proceeds of Collateral come into Borrower's possession, Borrower will hold the same in trust and safekeeping, as the property of Lender, and immediately turn over such payment to Lender in kind when possible, or by wire transfer.

10.4     Borrower shall ensure that Lender at all times has a list of all Borrower's deposit accounts.

11.     **Negative Covenants**.  Borrower will not: